Good morning everyone. This is Judge Sykes. I'd like to thank everyone in advance for your patience with telephonic arguments this morning. I will be keeping time and I will give the appellant's counsel a one-minute warning when you are approaching your rebuttal time that you've reserved and I will give all counsel a one-minute warning when you're approaching the end of your versus the Village of Hobart. Ms. Locklear. Yes, good morning your honors and thank you and may it please the court. My name is Arlinda Locklear and I am counsel for the appellant Oneida Nation. The question in this case is whether the Oneida Reservation located in northeast Wisconsin has been reduced in size by more than 75 percent, thereby subjecting the nation to regulation by the appellee Village of Hobart. The district court found that the reservation, a compact area of 65,400 acres, was created by treaty in 1838 between the nation and the United States. In 1889, the treaty was the treaty created reservation was allotted pursuant to the general allotment or the Dawes Act of 1887. The Dawes Act, a statute of general applicability throughout the country, authorized the president at his discretion to issue allotments on any Indian reservation to members of that reservation with trust patents to be held for 25 years. As to some reservations, Congress also enacted surplus land acts referring to land remaining on the reservation following allotment for settlement by non-Indians. Courts have construed some of these surplus land acts as abolishing or diminishing the boundaries of the affected reservation. There is no surplus land act applicable to the Oneida Reservation. Nonetheless, and relying on cases that construed specific surplus land acts or a unique allotment act that applied only to those particular reservations, the district court held that the Oneida Reservation has been diminished. According to the district court, this occurred over time as allotments passed out of trusteeship and were conveyed in fee to non-Indians, thus reducing the reservation to individual parcels scattered throughout the reservation, randomly located and known generally as checkerboarding and totaling about 14,000 acres. This judgment directly contradicts a 100-year-old body of Supreme Court authority that construes the general allotment act as leaving reservation boundaries intact. The judgment also unsettles the status of literally dozens of other reservations across the United States that were also allotted under the general allotment act. Judge Hamilton, could you tell us what kinds of current effects the district judge's decision is having while this appeal is pending? Well, there are none while the appeal is pending, Your Honor, because the parties have agreed to stay the effect of the judgment pending the appeal. Okay, thank you. However, those will change dramatically unless this judgment is reversed following this by as a result of this appeal. Returning to the argument, Your Honor, it's important to point out that as your question suggests, the judgment below also undermines a widely held and shared view regarding the continuing vitality of the 1838 treaty reservation boundaries. This widely held view underpins a number of compacts and contracts between the nation and the state of Wisconsin, local counties, and local municipalities. These agreements affect a wide range of issues including law enforcement, gaming, tax collection, and other issues. As a result of this judgment, these agreements are all now in jeopardy. Is there any reason in your viewpoint for us to wait for the Supreme Court's rulings in the Murphy and McGirt case that are before it this term? There is not, Your Honor, and here's the reason why. Those cases involve a statute other than the General Allotment Act and the Burke Act, which are at question here. Those cases arise out of Indian Territory or Oklahoma, and Oklahoma was expressly accepted from the General Allotment Act and instead was allotted pursuant to specific statutes that apply to those reservations. So there is nothing that will come out of those cases that will teach us anything about the General Allotment Act, the Burke Act, or anything regarding allotment at the Oneida Reservation. So it is not necessary to await the results there. However, there is a large body of Supreme Court cases that's more than In addition to those cases, however, the village of Hobart in its papers here also raises two additional issues. First, it argues, it disputes the district court's judgment that a 1933 unpublished opinion to which the nation was not a party and which held that the reservation had been abolished has no preclusive effect here. In addition, the village also challenges the existence of so-called exceptional circumstances under which it claims authority to regulate the nation, even if the reservation remains intact. Those issues are raised by the village without the benefit of a cross appeal, and unless the court has questions on those issues, the nation will submit on them on its brief. Instead, this morning, I will focus on this important body of Supreme Court cases that the nation believes determines the outcome of this appeal. There are three important principles that I will address this morning. First, this body of Supreme Court cases clearly and explicitly rejected the proposition of the Allotment Act and the Burke Act had the effect of diminishing reservations either by allotment or by the eventual consequences of allotment in the transfer of those allotments to non-Indians and C's. The first such case that makes this holding is 1909, the Supreme Court's 1909 decision in United States v. Celestine. In that case, the reservation had been allotted in accordance with a treaty, which terms of allotment were nearly identical to those of the General Allotment Act. Indeed, the Supreme Court relied upon authority construing the General Allotment Act to come to its conclusion that allotment under those provisions did not have the effect of abolishing the reservation. It so held even though the individual tribal member had been issued a patent to that parcel. The Supreme Court teaches us the extent of this decision in 1962 in its opinion in Seymour v. Superintendent. Seymour involved a reservation that had been allotted directly under the General Allotment Act and to which many parcels had been conveyed in fee to non-Indians. Indeed, the parcel that was the subject of that decision was a fee parcel held by a non-Indian. Nonetheless, the Supreme Court relying upon its decision in United States v. Celestine held that the court had consistently construed the General Allotment Act to preclude the diminishment or disestablishment of a reservation. In that case, the court went even further. The state of Washington raised two arguments in that case with regard to the Colville Reservation. First, the state argued that the reservation had been disestablished and citing its decision in the Celestine case, the court held that that clearly was not the case. Secondly, and in the alternative, the state of Washington also argued that if not over time, much like the argument of the district court below, by the passing of title to non-Indians in fee. Citing Celestine, the Supreme Court in Seymour specifically rejected this proposition and again held that there is nothing either in the terms or the effect of the General Allotment Act that had the effect of limiting or abolishing reservation boundaries. Ms. Locklear, this is Hamilton again. Could I ask you, in the cases where the Supreme Court has confronted the prospect of so-called checkerboarding jurisdiction or diminishment of reservations, has the court ever endorsed that approach? No, Your Honor. There's not a single case and in fact it's remarkable that the district court cannot cite a single case where the court relied upon the simple conveyance of title either by a formal allotment or by open surplus land to a non-Indian in fee that would have the effect of diminishing reservation boundaries. And in fact, the Eighth Circuit, the Ninth Circuit, and the Tenth Circuit Courts of Appeals have relied upon consistently the Supreme Court's decisions in Celestine and in Seymour for the general proposition that it is clear that the mere passage of title alone without more in fee to a non-Indian on the reservation has no effect on reservation boundaries. To follow up on that, could I ask you to address the Brendale decision and in particular, and to see if I'm understanding the way this law works, in Brendale, if I recall correctly, there was no issue at all about changes in the reservation boundaries such as we face here. But instead, what the court wound up doing was saying that with respect to land use controls, there might be some changes in jurisdiction or there were some changes or reductions in jurisdiction with respect to that particular exercise of governmental authority by tribes. Is that an accurate statement or would you correct me on that? I think that's a fair statement of the law, Your Honor. There is a body of Supreme Court cases that reservations. And in several cases, the Supreme Court has indicated in Brendale as well as Montana versus United States and others that the mere fact that the non-Indian holds fee title to some portion of the reservation leaves the reservation intact but may limit tribal jurisdiction over the non-Indian. The Supreme Court's been very clear that even though those parcels remain a part of reservation, unless there are either consensual agreements between the non-Indian who holds the fee and the tribe, or if there's a serious impact on the tribe's health, welfare, or safety of its members, the tribe lacks jurisdiction to regulate that non-Indian activity on their fee land, be it land regulation, hunting and fishing, but nonetheless, those parcels remain a part of the reservation. And if the district judge in this case was obviously troubled by the consequences of ruling in favor of the United Nation in this case, if I understand this correctly, if we were to reverse, then in essence, the village's authority or the scope of the tribal authority over these lands owned in fee by non-tribe members would then in essence be subject to that body of law and to this network of intergovernmental agreements that you referred to a few minutes ago. Is that breathtaking implications, close quote, from the nation's position that the reservation remains intact? In fact, it's the contrary. The breathtaking implications flow from the district court's decision that the nation's reservation has been diminished. Let me identify two areas where this explicates this limitation on tribal authority over non-Indians. In 1978, the Supreme Court ruled in the Oliphant v. Duquamis case that tribes lack jurisdiction over the criminal activity of non-Indians on their reservations altogether. And as we indicated earlier in the Montana case, the court also very narrowly circumscribed the authority of tribes over non-Indians for civil regulatory matters on their fee lands on in all of those cases to make clear that nothing in those jurisdictional limitations suggests that the reservation boundaries have been altered or abolished. To the contrary, they remain reservations but with tribal authority over non-Indian activity and their fee lands therein narrowly circumscribed. But the court's decision here would undermine all of the decisions that I referenced before and all of the compacts and agreements that the nation operates under now. Let me give you an example, Your Honor. Law enforcement. Wisconsin is what's referred to as a public law 280 state. That's a statute that Congress enacted in 1953 which authorized certain states to exercise civil and criminal jurisdiction over reservations in their borders. Wisconsin is one of those states. As a result, Wisconsin holds civil and criminal authority over the Oneida Reservation. Shortly after public law 280 was enacted, the state of Wisconsin also enacted its own statute as to how it would exercise that jurisdiction. And in that statute, the state of Wisconsin says as to certain reservations, including Oneida, those tribal police may be authorized to exercise the state's civil and criminal jurisdiction on that reservation if those officers are certified under state law to meet the standards and be aware of the applicable law. The nation has such deputization, so-called deputization agreements with both Brown County and Outagamie County where the reservation is located that authorize its 19 officers to actually exercise state authority over law enforcement authority on the reservation. However, under the judge's decision, instead of the 65,400 acres that is now the premise, reservation that is now the premise of those deputization agreements, the nation's jurisdiction is restricted to the roughly 14,000 acres that are scattered throughout the reservation. Law enforcement becomes problematic, if not impossible, under those circumstances. And the entire system under which the reservation is now governed in that regard will be completely overturned. While this case is pending, would there be potential for challenges to criminal prosecutions initiated by officers in the areas of the reservation that the district court treated as diminished? We've had no indication of that so far, Your Honor. Fortunately, the nation has the good fortune of having the state of Wisconsin join it as amicus in this case, and the state remains- I'm thinking that criminal defendants might not be quite as accommodating. That has not happened yet, Your Honor. Obviously, that would be a concern going forward. But under the circumstances as they now stand, both the state and the local counties have agreed to continue to abide by the deputization agreements, and law enforcement has not yet been affected on the reservation. Can I ask you one other quick question before we shift gears here, and that is about section 1151 on the Indian country definition. Yes, Your Honor. My question is, as applied to allotted lands and patented lands, could that 1948 enactment have had any effect if it did not apply to allotments that occurred before 1948 and, in fact, before 1934? Well, that is an artificial distinction that the district court adopted in limiting the reach of the Indian country statute. In that respect, the Indian country statute, when it codified the law in 1948 with regard to the definition of Indian reservations, which included such lands, the Congress was simply codifying the federal common law as it had existed since at least 1909 in the Celestine decision. Because in the Celestine decision... I understand that point. I'm just asking about practical effect. It's my understanding, correctly if I'm wrong, is that allotments ended with the 1934 Reorganization Act. That's correct. You are correct, Your Honor. So, to the extent that section 1151 applies to any allotted lands later conveyed to non-Indians, for example, that's the only kind of land that the 1948 statute could apply to in that respect. That's correct, Your Honor. There would be no subject for section 1151 to apply to in that event because there were no lands allotted after 1934 to non-Indians, or that could be conveyed to non-Indians. Allotments were frozen as of 1934, and so for there to be a class of allotments for the 1948 statute to act upon, it would not exist. Thank you. And that's another reason... Liz, you have one minute to your rebuttal time. Thank you, Your Honor. There is one final Supreme Court case that I think draws particular attention to this case, and that's the Supreme Court's decision in Nebraska. At the end of the day, what we have here is an argument that by acts that occur on the ground, by so-called de facto diminishment, that the reservation can be abolished. The Supreme Court explicitly rejected this theory in its unanimous 2016 decision regarding the Omaha Reservation with reference to an area where not a single acre of trust land remained, and it appeared that there were no Indians in occupation of any remaining trust land. That being the case, there is no circumstance under which this court can rely on the District Court's judgment to find that the Oneida Reservation has been abolished. Thank you, Your Honor. Thank you. Mr. Kowalkowski. This is Frank Kowalkowski. I represent the village of Hobart. Also present with me is Matt Tone, who also represents the village. If it may please the Court, I would like very briefly to touch upon one of the arguments in our brief, which is issue preclusion, before I address some other points brought up earlier in today's discussion. Obviously, that item is brief, but one of the things I do want to point out is that that case, the Stevens case, was brought, as it states, in the name of and on behalf of the tribe. The paperwork, the complaint, was signed by Mr. Skinnador, who the nation's own experts described as a tribe's chief, the tribe's chairman, and someone authorized to act for and on behalf of the tribe. So I believe that case is dispositive of the situation we have here, where the issue of diminishment stemming from allotments was directly addressed. The Court referred to prior Supreme Court case law when coming to the conclusion that the land at issue was no longer part of reservation because of those allotments. Would you agree, Mr. Kolokoski, that under current law, the Stevens holding of abolition or disestablishment of the reservation would be incorrect? I would not. The reason for that is... So you don't think the district judge was over the 14,000 or so trust acres? The trust parcels are a different issue because that land for which trust status exists was created after 1934 and the creation of the Indian Reorganization Act. It was that subsequent activity, subsequent to diminishment, that that land came into existence. Prior to that, 95 percent... I thought you were arguing here abolition. I'm not certain exactly what you're referring to in that regard, but... That's what the Stevens Court held, correct? The reservation had been disestablished. True. And that's what you're asking us to hold. Correct. But I don't see how we can do that in absence of a cross appeal. Your Honor, we're asking that the judgment be upheld. And a judgment can be upheld on any grounds within the record. The judgment is that the village's special event ordinance applies to Applesauce. That can be done either via the district court's reasoning or also via the preclusion issue, which is briefed and in the record. But an argument, Mr. Kolokoski, that the Stevens case has preclusive effect is an argument for an enlargement of your rights. You're asking us to give preclusive effect to a disestablishment decision, not a diminishment decision, and that's an enlargement of rights. There's a significant difference between disestablishment and diminishment, as Judge Hamilton mentioned here. There's a distinction between those two things. And you're asking for an enlargement of your rights. The treaty would no longer be in effect at all if we gave preclusive effect to that case. Your Honor, first, I would indicate that in practice, that is not the case because the district court did rule that 14,000 acres of the United Reservation remains in trust. It is Indian country, and therefore, nothing would change in that regard. So the fact that under Stevens, the reservation was disestablished does not alter what happened in 1934 and the subsequent placement of 14,000 acres into trust. So the net result as of today is the same because of the Indian Reorganization Act. There really isn't any difference in terms of how the district court's decision could truly be applied here in terms of which parcels of land. If Stevens' action took place before the federal rules of civil procedure were in place, especially Rule 23 on class action, how should that impact our decision? Well, first, I would indicate that it is brought by someone the nation's own expert confirms had the authority to bring it on the nation's behalf. He indicated he was bringing it on the nation's behalf, and that is the way in which things were done as far as the tribe was concerned typically. So I don't think that impacts things because it is worded as precisely being on the nation's behalf by the authorized person to do that, and I think that's true regardless of this rule of civil procedure on class action. I thought it was brought on behalf of tribal members. Does that make a difference? It was brought on behalf of all the tribal members as authorized and represented by Mr. Skinnador to have the authority to do that, and bringing actions on behalf of the tribe at that time is how things would have been brought because we have to remember this is prior to 1934 and the creation of the United Corporate Charter pursuant to which a different formation of its government came into existence. Back prior to the Corporate Charter under the Indian Reorganization Act, that's how things would have needed to have been brought by the nation and in fact was. It wasn't brought on behalf of all class members because it wasn't brought on behalf of the ones who had trust patents, and that was clear in the town's answer to the complaint. I would agree that trust patents would have a different situation as currently exists in terms of the 14,000 acres. Those would be part of or remain part of the 14,000 acres, but the actual implication of the case remains exactly the same as the district court here. There's 14,000 acres that are Indian country. The rest is not, and that's true whether you apply the district court's decision. If I may turn to our argument in general, I believe the test is not some sort of hallmark language or magic words which must appear in an act in order for a reservation to be diminished or disestablished. The test is, is there some evidence of congressional intent to do those things, and there is- Some evidence? We're talking here about the United States breaching a treaty, correct? I don't believe so, your honor. We believe there are congressional acts- Counsel, the Supreme Court said in Lone Wolf that Congress has the power to abrogate or violate treaty obligations that the United States has entered into, but it's got to do so clearly, right? Surely you're not claiming Nebraska against Parker says that some evidence is enough. No, it is not. Okay, and I'm sorry if I misspoke in that regard, but there is Supreme Court precedence that clearly states using the word the policy and the purpose of the Dawes Act was to distinguish reservations and end reservations, and I believe it is that line of cases which shows there is a clear expression by Congress that the intent of allotments under the Dawes Act, not the original allotments, not while they're still in trust or have some protected status, but the eventual process, all of that was to end reservations as the Supreme Court has clearly held in Montana, and as the 7th Circuit, as this court has indicated in Wisconsin versus Stockbridge-Munsee that every congressman believed reservations were a thing of the past and would soon disappear because of the allotments that were occurring in this era. How can you make that argument, how can you rely on that argument in light of the Supreme Court's opinion in Solemn? They don't say, if the Dawes Act were the basis that you could say there was disestablishment or diminishment, then they wouldn't have needed to turn and look at at anything else. It seems that is completely inconsistent with Solemn. Well, Solemn is a surplus lands act case, and it looks at the three criteria relating to that type of an act, and it looks for words of cession or return to the public domain. The village's point is that if the diminishment stems from allotment, those type of words would not be expected. In fact, they would be nonsensical in the context of allotments. I think that's why, in part, the Supreme... Is it your argument, then, that Solemn only applies if there's a surplus land act at issue? To the extent Solemn's proposition is there must be an express statement by Congress to diminish or disestablish a reservation, I believe that applies in all contexts. I also believe that there's more than one way to accomplish that. It could be via a surplus lands act, in which case you examine that language to see if it talked about ceding the land or clear indication the land was given up or simply opened for settlement. Another way to do it is... Is it your theory, then, that simply opening reservation lands for non-Indian settlement is enough to diminish? It is not, Your Honor. We don't believe that is the case at all. We believe, though, that the allotment process, the Dawes Act, and in this case, the 1906 Act applicable to the Oneidas only, the 1917 Act getting rid of their school, all show that this route was the allotment route. The United States, in its amicus brief in the Murphy-Carpenter case, has even indicated the Supreme Court's prior disestablishment cases have considered whether to diminish the reservation through surplus lands acts. The phrase public domain session and things of that nature would be inappropriate when Congress acted to break up tribal territory through allotment. So we're taking that position that this is a different road to accomplish diminishment or disestablishment. You still need clear congressional intent, but it doesn't have to be through a surplus lands act case. And in fact, it would make no sense to look for that of language in allotments. There was no surplus lands left to open for settlement or to do anything with. The Oneidas is what has been noted by Commissioner Collier as one of the extreme cases of allotment, meaning it went so far down the planned path of how the allotments were supposed to extinguish reservations. The own expert of the nation in this case discussed the 1906 Oneida provision as a remarkable piece of legislation supported by Congressman Minor, who was unsatisfied with the scope and extent of the Burke Act in terms of eliminating the Oneida reservation. So it's this allotment path that culminates for the Oneidas with the 1906 Act and in 1917, the sale of their school that results in it. So Salem, Parker, the cases that indicate you congressional intent absolutely apply, but they're focusing on surplus land language, and there is no surplus land in this case. If any of these allotment acts give the clear congressional intent that you're talking about, why would the Supreme Court have had to look to the surplus land act in those cases? Well, they're different situations. I think Salem makes it clear that you cannot jump to the conclusion that, and it uses the word, every surplus land act was designed to diminish or disestablish a reservation. So it simply indicates, look at the language, determine if that was Congress's intent. Now for allotments, it's similar. You look to the intent of Congress with the string of allotments acts applicable in this case, and we have the Supreme Court using the word. If that was the policy, if that was the purpose of these allotment acts, it would still be a distinguished reservation. If I may ask, counsel, if I may ask. I mean, yeah, policy, purpose, we have Parker saying focus on text. And I guess, can you point us to Supreme Court authority that has diminished reservations in this sort of checkerboard fashion on the basis of allotments? Well, Your Honor, that has never been brought in front of the Supreme Court. I believe that is an issue of first impression, as is the argument that these allotments under the Dawes Act can remove a reservation status. I disagree with the nation when they said the Supreme Court has clearly indicated that is not a possibility. I do not believe there is a case where the Supreme Court has held allotment through a string of allotments, such as we have here, allotment acts could not diminish a reservation. In fact, has it ever endorsed the notion that allotment could produce a checkerboard diminishment upon conveyance to non-Indians, changing the boundaries of the reservation? In Moss specifically, the court was looking at some allotments through which there were restrictions on the allotment, restrictions to alienation, and indicated that did not get rid of a reservation. But the Moss court said when all the lands had been allotted and the trust period expired, the reservation could be abolished. So to the extent there is Supreme Court precedent, which at least touches on the issue, I think it's Moss foreshadowing that. But the rest of Moss is pretty hard to reconcile with your view here. In particular, its treatment of the Seymour case is saying that the act nearly opened the way for non-Indian settlers to own land on the reservation in a manner in which the federal government, acting as guardian and trustee for the Indians, regarded it beneficial to its boards. I mean, we see Moss pretty clearly rejecting the notion of a checkerboard jurisdiction, which is where your argument points, right? Well, a few things. First of all, the language in Seymour is referring to land opened up for non-Indian settlement, not allotments to Indians. Second, the case here with Oneidas was there really wasn't a checkerboard that resulted in the allotment. Ninety-five percent of the reservation was in the hands of non-Indians in the early 1900s. So it did not create a checkerboard problem at all, nor was it intended to, and it didn't. To the extent there's any it was because of the enactment of the Indian Reorganization Act, which allowed land to be acquired in trust for the tribe, even though it previously lost 95 percent of its holdings. Counsel, what are you arguing was the triggering event here for the diminishment? The district and conversion to the Indians, what do you think was the triggering event? I believe the triggering event was the removal of all restrictions of the passage provided to the Native American, and when it was free of all restrictions, that is what terminated. The district court, to the extent... So it doesn't take conveyance to non-Indians? It does not have to, but we have that extra step here. So if there was ever any question, if with simply the removal of the restrictions on a parcel held by the Indian was inadequate, which I don't believe there is, we still have the fact it did occur here in terms of going to non-Native Americans, which is the Eighth Circuit's holding in Gaffey, and which is why Cohen, the most recognized treatise on federal Indian law, says whether or not conveyance of reservation or diminishment is an important pending question. That also suggests that the nation is overstating things when it says Supreme Court precedent has clearly confirmed that is not a possibility. If that were true, the current edition of Cohen's handbook wouldn't label that an important pending question. Also, I would point to this court's decision in the Stockbridge-Munsee in terms of the question of what's the triggering event, when it looked at the 1906 Act language applicable to that tribe, and it said, well, why have this particular provision allowing the land to go into unrestricted fee status immediately? And this court... How are the 1906 provisions for the Oneida different from those for the Stockbridge-Munsee tribes? To me, the biggest difference stems from the fact that the Oneida Nation was much farther down the road to allotment and diminishment or disestablishment because it was an extreme example of application of allotments at the time. The Stockbridge, on the other hand... I'm sorry? In 1906? Yes. Yeah. At that point in time, the Oneida Nation already had the allotments handed out to the tribal members. In 1906, it may not have all been unrestricted or in non-Native American ownership, but the allotments occurred. For the Stockbridge, it didn't. So that is the first language in the 1906 Act relating to the Stockbridge, directing the secretary, indicating he shall issue allotments, and then getting into the point which would be held in fee. So we skipped the first part for the Oneida because the allotment part already occurred. So it would be a bit ironic that the fact that the Oneida Nation is farther down the road of diminishment because of allotments already occurring for its reservation to be distinguishing characteristic between the two acts that somehow results in a different holding here. So we have to look at what was existing for those two tribes at this time. The thing that is important... What effect should it have that the 1906 Act was mandatory on the secretary for giving allotments with respect to the Stockbridge and was discretionary with respect to the Oneida Nation? Doesn't that signify something? If anything, that signifies a matter of degree. The fact that the secretary has the ability to do it is what is significant, something the in general for tribes like the Oneida or Stockbridge who did not have a specific act applicable to it in particular. So if that discretion is basically a matter of degree and perhaps timing, but it is not a change in substance, the key issue is, does secretary have the ability to instantly have all of that property be feed with zero restrictions? And that's I think the importance of the Seventh Circuit's decision in Stockbridge, although admittedly, the language is a bit different, but the tribes are situated differently at the time. Well, our opinion in that case emphasized that this was anything but, that the Stockbridge-Luncey provisions were definitely not a run of the mill allotment statute, right? Yeah, and that's the exact same thing the nation's expert held or testified in this case, that the 1906 provision relating to the Oneida, in his words, was a remarkable act pushed by congressmen not satisfied with the Burke Act because it didn't terminate the Oneida reservation quickly enough, did not open the land to white settlement quickly enough. So according to the nation's own experts, the two acts are aligned in the terms of their significance. How do you respond to Wisconsin's argument relying on the county of Yakima case, that early fee patents under the Burke Act permitted only taxation of the land and not an exercise of general jurisdiction? I know it wasn't a disestablishment or diminishment case, but given the language and the holdings, I think it's important to understand that what's your response to that? Your Honor, I'm not entirely clear if I understand your question. As far as the jurisdictional issues that might have existed, typically are linked to whether the land is fee patented or released of all restrictions. Also, there was the issue with the Burke Act of when did someone become a citizen in terms of was it upon receiving a trust allotment or was it only upon a fee patent? The Burke Act being created, I think, in response to the Heft decision in terms of that timing. So I think that the language relative to jurisdictional control does not change the issue that allotments under these series of acts did ultimately remove land from a reservation. And to some extent, as the case law indicates, and I believe in the Stockbridge-Munsee case, the loss of federal government jurisdictional controls sheds light on that as well. We're here, just like in Stockbridge, issues relating to alcohol problems were repeatedly indicated by the federal government to be something the state had to deal with. Issues regarding hunting licenses and permissions were repeatedly stated as being something the state had to take care of. That's pretty much true with jurisdictional issues across the board at that time frame after the allotments were in fee and people were deemed to be citizens of the state in which they reside. Your Honor, I would like to touch upon also the subsequent history here. I believe it rather clear from the record that the federal government, the state of Wisconsin, and the nation itself all deemed the reservation to be diminished, if not completely disestablished. We indicate those items in our brief and some of the key examples. But even the nation itself, in more than one publication, indicated its reservation was believed to have been decreased in size. So the... Could you address what your expert meant by the phrase mixed record? Well, you have a mixed record in terms of... First of all, the substantial evidence, I believe, our expert indicated that the reservation was diminished. To the extent there's a mixed record relative to diminishment versus disestablishment may be true because there was some confusion as to was there only 80 acres left remaining in trust? Was there 100 acres? And there is a bit of a mixed record on diminishment versus disestablishment. As to diminishment standing alone, I don't believe the record is mixed. Your Honor, the other issue I would like to bring up here is some of the federal agencies under the Dawes Act, including the Commissioner of Affairs, have used phrases like the land has been turned loose. They do not have jurisdiction. That indicates a clear understanding at the time, which is what needs to be looked at here, that the federal government understood that to be the case. I think the Stevens case, even if issue preclusion does not apply here or is not considered, is evidence of, again, the federal government of Eastern District of Wisconsin Court believing that was the case at the time, as does the Hall case, in which another federal district court case refers to this area as the former reservation. So you add that from basically all levels of the federal government, as well as the state at that time, indicating that the reservation was decreased in size. The record is far from mixed. One other thing I'd like to jump to quickly here is on the fact that Judge Griesbach's decision about the ramifications here is not overstated in our is the nation shut down and barricaded a village road because they believed this was all occurring within their reservation, and therefore they had the jurisdiction to do this and not the village. So that's a pretty exceptional circumstance. If a nation is allowed to shut down a road under the jurisdiction of a state-based government, that's pretty significant. The issues that could stem from that are far-reaching. This is also an extraordinary event in that this event literally doubles the population of the village in two days from 8,000 to roughly 16,000 because there's 8,000 guests that come to this, the vast majority of whom are non-Indians picking apples on sea land, not trust land. So there are some exceptional circumstances or significant issues here, which, regardless of the existence of the reservation, makes the judgment of the district court correct, the judgment again being that the special event ordinance needed to be adhered to by the Oneida Nation in this particular case. So that is, I think, something that the court was well aware of and concerned greatly. We also see situations of the Parker case being an example of tribes extending extreme authority or attempting to over non-Indians on their own sea land because it's purportedly in a historic reservation, 10% tax on all liquor sales. We have a situation here in Oneida where the tribe asserts jurisdiction on environmental issues because they believe it's part of a reservation. There is a large amount of reported jurisdiction the tribes claim across the country on sea land owned by non-Indians, and that has continuously led to jurisdictional fights. As far as that being mitigated with governmental agreements, I would note the village of Hobart has no such agreement with the Oneida, nor does the city of Green Bay, and 14% of the historic reservation is within that city. They don't have a service agreement either. There may be some other nominal agreements, but the primary service agreements which you typically see when you have this attempt at cooperation don't exist for the village of Hobart nor the city of Green Bay. So again, raising large jurisdictional concerns if this property is deemed to be still part of a reservation. At the end of the day, I believe the district court correctly applied the same logic that the Eighth Circuit did in Gaffey and Podastke because the congressional intent for allotment eventually going to non-Indian ownership was intended at the time, at the turn of the century, to in fact disestablish reservations, and that is the timeframe that the court should focus upon. So the fact the United States argues that the Gaffey decision from the Eighth Circuit was flawed and should not be considered by this court suggests or certainly implies that if that logic is something the Seventh Circuit would also adopt, the district court's decision here is correct. You have one minute left. I'm sorry? You have one minute left. The final point here is that you need congressional intent, not certain hallmark language. Language that would not be expected if the diminishment is through allotments. There are diminished or disestablished reservations, MOTS being the primary one that specifically indicated that once the allotments were gone and the trust period expired, the reservation could be abolished. Gaffey also squarely supports the district court's decision. The district court relied on it. That is another issue as to exactly why this reservation would be diminished at the time the congressional acts we're talking about were enacted. It was not believed reservation would exist once it fell out of Native American ownership. Right. Thank you very much. Thank you. Yes. Thank you, Your Honor. A few very brief points. First, with regard to the expansion of the judgment that would result through application of the Stevens case here, it should be noted that all of the trust land that the village refers to as would remain and retain reservation status was taken into trust by the United States for the nation under the terms of the Indian Reorganization Act of 1934. The IRA, as it is known, authorized tribes to organize and be eligible for benefits under that statute in one respect if those tribes were in residence of a reservation. In 1936, the Department of the Interior concluded that the Oneida Nation was in occupation of a reservation by specific reference to the boundaries of the 1838 treaty and as a result was eligible for services under the IRA. Were this court to apply the Stevens judgment to abolish the reservation altogether, it is questionable whether or not the nation's eligibility for IRA benefits, including trust land, would survive. Indeed, this is not a fanciful concern on the nation's part. The village of Hobart itself repeatedly and consistently raises the alleged inapplicability of the IRA to the nation in every pending administrative appeal where it challenges a trust decision by the BIA. So there's no question that there would be an expansion of the judgment were the court to apply the Stevens judgment here. Secondly, with respect to the village's argument with regard to the distinction between allotment and surplus land acts, it should be noted that Section 5 of the 1887 General Allotment Act authorizes both. It authorizes the president to allot reservations as step one and as step two, it authorizes the president to enter into negotiations with individual tribes for the land. The act makes no distinction between land that might be transferred with regard to the effect of that and the Supreme Court made no distinction in any of the cases that we cited with regard to whether the land was obtained in fee as a result of allotment or as a result of a surplus land act under that statute. In fact, in every case, allotment always preceded the passage of a surplus land act and yet in every case, the Supreme Court held that the reservation had not been disestablished or diminished. Allotments occurred in the Cheyenne River case in Solemn v. Bartlett and yet the court held that the reservation remained intact. Allotment occurred as to the Omaha reservation in the Nebraska case and yet the court held that the reservation remained intact. Finally on this point, I would point the court to the Gaffey case that the village relies on quite heavily. The Gaffey case involved the Yankton Sioux Tribe reservation in South Dakota which had been allotted and then was the subject of a surplus lands act. The Supreme Court held in its decision that the surplus lands act diminished the reservation with regard to the ceded land but made no finding with regard to the unceded land which consisted mostly of the allotments that had been issued. As a result, the 8th Circuit dealt with that decision, that issue in the Gaffey case and in that case, the court was very clear that it relied upon the effect of the surplus land act, not the general allotment act, to conclude that the transfer in fee resulted in diminishment of the boundaries. Specifically, I refer the court to page 1024 of the court's decision published at 188 F. 3rd where the court says, if Congress's general understanding that tribal ownership was a necessary component of reservation status controlled, all land which found to have lost its reservation status. A conclusion the Supreme Court has explicitly refused to accept. And then later in its decision at page 1028, the court specifically finds in sum the 1894 act referencing the surplus land act, not allotment, did not clearly disestablish the reservation but it intended to diminish the reservation by not only the ceded land but also by the land which it foresaw would pass into the hands of white settlers and homesteaders, that is, the allotments. So the court is very clear that neither of those events authorized by section 5 of the general allotment act, allotment or a surplus land act, had the effect on its own of abolishing or diminishing reservation boundaries. Some further act was required. And if I may say one final word with regard to the 1906 Oneida provision, that statute, there is nothing unique about it at all. It is simply a tweak to the implementation of the general allotment act on the Oneida reservation which gives the secretary discretionary authority, as the court observed, to issue allotments before the expiration of the trust period. However, the village is incorrect that that occurred in 1906. It did not. That occurred over time. In fact, the original trust patents were issued in 1892 and were not scheduled to expire until 1917. Before 1917, several parcels were indeed already granted, several allottees were already granted patents in fee. But if you look at those patents in fee, you'll see that it cites, they cite the Burke act and not the 1906 Oneida provision. So there's nothing either in the language, the circumstances, or the consequences of application of the 1906 act that should result in anything that's different. And finally, with regard to the 1906 act, it is simply one of several, in fact, dozens of similar provisions that Congress enacted from time to time to tweak the implementation of the general dollars act to a particular reservation. At least 10 others apply in the same, appear in the same 1906 appropriation act along with the Oneida provision. In the appropriation act in the year preceding, in 1905, there were literally a dozen more. And no court has ever held those acts to have the effect of diminishing reservation boundaries. Can I ask you to briefly address the 1917 legislation with respect to the schools and education on the Oneida reservation? Yes, your honor. First of all, as the court observes, there is a difference in time there. The alleged diminishment of the reservation occurred in 1906. And while the court may examine unequivocally held views that are contemporaneous at the time of that act, there is no court suggesting that something 11 years later in the 1917 school lands act may be evidence of Congress's intent with regard to the 1906 act. Secondly, the 1917 act was nothing more than an authorization to the secretary to sell for the tribe's benefit, which anticipated a continuing relationship, the land that had been set aside at the time of allotment for purposes of school lands. This was just in anticipation of transferring the BIA's jurisdiction from Oneida itself to the Kashina agency at the Menominee reservation. And it was principally for that administrative purpose. There is nothing either in the language or the act to be evidence of an intent to diminish the reservation boundaries. Thank you. So for these reasons, your honor, there is simply at the end of the day not a single authority that authorizes a court to find the diminishment of the Oneida reservation based on the act of allotment alone. This case is the district court made a decision here that is unprecedented with any authority behind it and has breathtaking consequences that are the opposite of those that the court itself found. And for these reasons, we believe that the district court must be reversed. Thank you. Our thanks to all counsel. The case is taken under advisement.